THE STATE *ex rel.* STEERS, *Appellant,* v. TAYLOR.

1. **Widow's Allowance, Husband Dying Childless**: MAY CLAIM A SEWING MACHINE. If a man die without children, his widow will be entitled to take as her absolute property the articles allowed her by section 33, article 2 of the administration act, (Wag, Stat., p. 88,) whether she elects to take her dower, or the half of his estate as allowed by section 5 of the dower act, (Wag. Stat., p. 539). A sewing machine is one of the implements of industry which she may claim under section 33.

2. **The** majority of the court is of opinion that there is sufficient evidence in the record to sustain the finding of the trial court upon the principal questions of fact involved in this case.

*Appeal from Johnson Circuit Court.*—HON. NOAH M. GIVAN, Judge.

AFFIRMED.

This suit was brought by Steers, as administrator *de bonis non* of John D. Carmack, deceased, against Taylor, who was the former administrator, on his bond. Taylor's letters were issued in October, 1872, and were revoked in January, 1876. The petition alleged, as breaches of the bond, that Taylor had failed to account for a sewing machine, the property of the estate; that he had failed to collect rent due from one Harris, to the amount of $79 ; that he had failed to collect a note of $20 due from one Aplin, and two notes of $300 each due from M. G. Ward and Burr Feagan ; that he had failed to collect sundry accounts

to the amount of $108.17, due from various parties; that the parties owing these notes and accounts were all solvent when defendant took charge of the estate, October 8th, 1872; and the same could have been collected by the exercise of proper care and diligence, but defendant had neglected to exercise such care and diligence. All the allegations of the petition were put in issue by the answer.

Testimony was given at the trial, as follows:

Thos. F. Melvin: Between 1872 and 1876, Ward was insolvent, and nothing could have been made out of him. Thought that Burr Feagan was not good, and nothing could have been made out of him; reasons for thinking so was his general reputation; know nothing of my own knowledge; was not very well acquainted with his financial standing; he was generally reputed to be bad pay; he resided some twelve miles from me.

A. M. Geer: Knew Dr. M. G. Ward during his lifetime; had some collections on him between October, 1872, and November, 1874; was generally successful, but don't know that he had anything subject to execution; am acquainted with the house and lot he bought of Carmack; it is worth $300 or $400 now; between October, 1872, and the spring of 1873, it would have sold for $500 or $600.

Mrs. M. G. Ward: Am widow of Dr. M. G. Ward, deceased; don't think his estate will more than pay expense of administration; don't think he was able to pay the notes in his lifetime; don't know Burr Feagan's financial condition between October, 1872, and January, 1876; visited at his house frequently during that time; he seemed to be well fixed and had some stock around him. The house Dr. Ward bought of Carmack still belongs to the estate of my husband; the judgment Taylor recovered is all the lien I know of against the property.

John R. Feagan: Burr Feagan is my father. Between October, 1872, and January, 1876, he was able to pay $600 with interest; he had that much property over and above what he could have claimed as exempt by law;

42—72

he had, as late as the spring of 1874, a bunch of cattle on the "Fields farm," and had a great many hogs, a great many of which had died the winter before from neglect, caused by our family having the small-pox, but there was more than 100 head left on the 17th day of January, 1874. I traded my farm for his; he bought his farm in 1857; it contained 275 acres; he owned this farm up to the early winter of 1873, or spring of 1874; he then sold the place to me for $6,900; there was an incumbrance on the place of $3,000; this was not later than 1874; he owned other property at that time; don't think he now owns or has owned any since January, 1874, subject to execution. This farm which I bought of my father was, during the years 1872 and 1873, worth from $8,000 to $9,000. *Cross-examined:* I know there were no judgments against him; the money on these notes of Ward and Feagan could have been made out of him between October, 1872, and January, 1876.

Capt. R. L. Ferguson: I knew Burr Feagan for a great many years; he was a substantial stock dealer; he handled a great deal of stock until January, 1874, when he became bankrupt; I knew the farm on which he resided and owned; it was worth from $30 to $40 per acre—in the aggregate $7,000 to $8,000; I think the notes he gave Carmack could have been collected between October, 1872, and January, 1876.

W. H. Steers, relator: Was acquainted with Burr Feagan up to January, 1874; he owned a good farm; had a good deal of property besides, and was able to pay his debts; that he had a conversation with defendant, Taylor, in the summer of 1873, in which Taylor told him that he had two notes on Burr Feagan and Ward in favor of Carmack's estate, and that they were good.

B. P. Taylor, defendant: I went to Sedalia in company with my attorney to look after the Ward and Feagan notes, and looked after them. I saw Feagan in 1873; he said he could not pay, and if any one pushed him he must

go into bankruptcy; examined records of Pettis county, and found a deed of trust of some $3,000 on his home place; also saw the deed of trust to Fields. I got the first lien on the property sold to Ward on the judgment against him; at that time the property was worth as much as my judgment against him; went to Ward a number of times about these notes; Ward paid Carmack $200 cash, at time he bought house. *Cross-examined:* Think I went to Sedalia in spring of 1873; it was a short time before I went to California; found deed of trust against Feagan for $3,000; this was all the claim we found; I know the land of Feagan; it was worth $15 to $20 per acre. Burr Feagan told me that he was not able to pay Ward notes after I came back from California in fall of 1873; that if he was pushed he would go into bankruptcy. Whether it was before or after I had gone to California that Fields, Prigmore and Melvin told me of Feagan's insolvency, I don't know. Never made statement to Steers in summer of 1873 that the Ward and Feagan notes were good.

Defendant offered testimony by defendant W. H. Wells, H. S. Witherspoon, Ransom Wells, D. H. DeArmon that the general reputation of Burr Feagan around Knob Noster was that he was insolvent, and closed his testimony with that of one Prigmore, who said: I live one and three-fourth miles from Burr Feagan's, in Pettis county; don't know of my own personal knowledge whether anything could have been made out of him or not between 1872 and 1876; his general reputation for solvency was bad. *Cross-examined;* Father had a note given him by Feagan in 1869; he collected some on it; he sold note in 1872 or 1873 at discount of $100; amount of note $800; amount due when he sold was $400; Feagan lived during time of 1872 to 1876 on a farm; he had a large quantity of stock; such farms as Feagan's rated from $20 to $30 per acre; it sold for $25 per acre; there was between 200 and 300 acres in the farm; heard from other parties that the claim father sold was afterward paid in full.

The evidence further showed that John D. Carmack died childless, and that his widow, Adaline Carmack, elected to take an undivided one-half of her husband's estate, under section 5, chapter 130, General Statutes 1865; and that the sewing machine mentioned in the petition had been turned over to her by defendant, she claiming it as her separate property, or if not, then as one of the implements of industry allowed the widow by section 33, page 88, Wagner's Statutes.

The court gave several declarations of law offered by the relator in relation to the measure of diligence required of the defendant in collecting assets of the estate, but refused to declare the law to be that if the sewing machine described in the first breach in relator's petition was inventoried as a part of the estate of John D. Carmack, then Taylor, as administrator, was responsible to relator as his successor for the value of said machine, unless it was shown that the machine was the separate property of Adaline Carmack; and that said machine could not be claimed by and delivered to said Adaline Carmack as part of other implements of industry, as provided by section 33, article 2, chapter 2, page 88, Wagner's Statutes.

*Land & Sparks* for appellant, upon the point that the widow was not entitled to the sewing machine, cited *Griffith v. Griffith*, 54 Mo. 283.

SHERWOOD, C. J.—I. It is unnecessary to say more concerning the correctness of the ruling of the court in the refusal of the declaration of law respecting the sewing machine, than this : We are all agreed that section 33, 1 Wagner's Statutes, page 88, confers upon the widow, as her absolute property, the articles therein enumerated, whether claiming as dowress, or as in the present instance. We discover no sound reason why a sewing machine may not well be included in the expression " other implements of industry," since such machines are, nowadays, in far

more common use than the wheels and looms of an earlier period. In this view of the subject, it is not worth while to make inquiry as to whether the machine was the separate property of Mrs. Carmack or not.

II. The majority of my associates are of opinion that the law of the case was correctly declared in the first and third declarations given at the instance of relator; that there was sufficient evidence whereon to base the finding in behalf of defendant, and that, therefore, the judgment should stand affirmed. I do not concur in the opinion as to the sufficiency of the evidence, not having been able to discover any evidence in the record which should accomplish the exoneration of the defendant, so far as concerns the note due by M. G. Ward and Burr Feagan.

Defendant qualified as administrator of Carmack's estate, October 8th, 1872, and his letters were revoked in 1876. Between those periods, I regard the evidence ample that a portion, at least, if not all the sum of $600, the aggregate amount of those notes, could have been collected from Feagan; and if any portion was thus collectible, the defendant was clearly answerable to that extent. On the 27th day of January, 1874, Feagan sold his home farm to his son for $6,900—there being 276 acres in the farm; this fixes the value at $25 per acre, and corresponds with the deed of that date, made by the father to son. Prigmore, a witness on the part of the defendant, testifies that the land of the home farm sold at $25 per acre, thus corroborating the statement of the son as to the price he paid. Captain Ferguson also testified that the home farm was worth some $7,000 or $8,000. This differs from the son's estimate by only $1,000, his estimate being $8,000 or $9,000. Taking, however, the price at which the home farm actually sold, we have $6,900 as an established basis of valuation; from this must be deducted the amount of the $3,000 incumbrance, leaving $3,900 to meet the demands of creditors. But it is urged that Feagan was entitled to his homestead in the home farm; grant this, and we still have

left $3,900—$1,500, leaving $2,400 wherewith to pay debts; and there were no judgments against Feagan. This estimate of Feagan's assets takes no account of his personal property, over 100 head of hogs, even after the cholera had swept away large numbers previously owned by him, and saying nothing of a " bunch " of cattle. I find no evidence in the record sufficient to combat and overthrow the above testimony. Evidence of the general reputation of Feagan's insolvency certainly should not be held sufficient in the circumstances of this case for that purpose. Such evidence of reputation is but a sorry makeshift at best, for something more reliable, and ought not to be admitted to countervail or be regarded as conflicting with positive testimony of the sort above mentioned. And I do not regard the excuse of defendant a valid one for not suing Feagan. He says he did not sue him because it would " make costs against the estate." But he did sue Ward, a joint maker of the same notes, and surely the costs would have been but trifling to have included Feagan in the same suit. For these reasons I do not think that defendant fulfilled that measure of diligence which the law required at his hands as administrator. 1 R. S. 1879, § 240; *Williams v. Petticrew*, 62 Mo. 460. As the majority of my associates are, however, of the contrary opinion, the judgment will be affirmed. HOUGH, J., concurs with me.